The opinion of the court was delivered by
Tilghman, C. J.
The appellees, Joseph M. Downing and Jane Stalker, executors of Thomas Stalker, deceased, (who, together with William Pim, was a guardian of the minor children of John Mitchenor, deceased,) were cited by the Orphans’ Court of Chester county, to settle the guardians’ account of their testator. They accordingly appeared and settled the account. John Pim, the appellant, contended before the Orphans’ Court, that the appellees should be charged with two-thirds of the sum of fourteen hundred and sixteen dollars and twenty-three cents, the balance which appeared to be due from the administrators of John Mitchenor, on the settlement of their administration account, the remaining third part belonging to the widow. But the court was of opinion that the appellees were not chargeable with that sum, and thereupon an appeal was entered. The administrators of John Mitchenor arc insolvent, and William Pim, who was co-guardian with Thomas Stalker, is also insolvent. The question is, whether Thomas Stalker, who did not receive any of the money which belonged to the minors, acted in such a manner, as to render himself responsible for .the money which was in the hands of his co-guardian, or of the administrators of John Mitchenor.
John Mitchenor died in August, 1814, leaving a widow, (Ann Mitchenor,) and three infant children. On the 3d of September, 1814, administration on his estate was granted to his widow, Ann, and h‘is brother, Ryner Mitchenor. In -May, 1815, Thomas Stalker and William Pim, (brother of the widow Mitchenor,) were appointed by the Orphans’ Court guardians of the children. About eight months previous to this, William Pim had gone into partnership in trade with his sister, the widow Mitchenor, and they had taken the store goods of John Mitchenor (who also had beeii a trader,) at their appraised value. .The firm of this partnership was, William Pim and Co. Thus, one of the partners (Ann Mitchenor,) was administratrix >0f her husband, and -the other (William Pim,) guardian of the children. Hence it happened, that the concerns of thé partners became mingled with the estate of John Mitchenor. Money received for the sale of goods, and money received on account of debts due to Mitchenor’s estate, were *70 kept, in tf e same drawer, and money was taken out of the drawer, to pay the debts of John Mitchenor. A book however was kept, in which entries were made (o show what was received, and paid, on account of Mitchenor's estate. It is a circumstance of some weight in this cause, that before Thomas Stalker consented to accept the guardianship, he was informed, that the court had refused to appoint William Pim sole guardian; so that he must have been sensible that he was the person principally confided in. After his appointment, Ryner Mitchenor (one of the administrators,) gave him information of the manner in which the business of the estate was transacted, at the store of William Pim and Co.; to which he made no objection; aud being asked by Ryner Mitchenor, whether he should go on to deposit the money received by him, in the drawer of Pim and Co., Stalker answered, that he might do so, and as soon as the account of the administrators was settled, he (Stalker,) would take charge of the money. In May, 1816, Ryner Mitchenor removed from Cluster county, to Columbia, in Lancaster county, having paid all the money which he had received of John Mitchenor’s estate (except about sixty dollars,) to William Pim and Co.; in consequence of the conversation which had passed on that subject between him and Thomas Stalker. In November, 1816, the administrators of Thomas Stalker settled their account; on which a balance of fourteen hundred and sixteen dollars and twenty-three cents was due from them to the estate. Before this settlement, on the 1st of April, 1816, William Pim and Ann Mitchenor dissolved their partnership, and sold their stock of goods to 'Brown and Baldwin for a considerable sum; which, together with the outstanding debts, the widow Mitchenor requested William Pim to receive, and keep it as the guardian of her children, after paying the partnership debts. The widow’s share of her husband’s personal estate she had received, having taken all the household goods at the appraisement, and received as much money besides as would make up the balance of her one-third. When the partnership of William Pim and Co. was dissolved, Pim went to live with Thomas Stalker, who was a farmer, and received from him wages at the rate of two hundred dollars a year, for working and superintending the farm. Pim swears, that when he went to live with Stalker, he had about six hundred dollars in his hands as guardian, and received one hundred dollars more afterwards; so that in the whole, there is about the sum of seven hundred dollars now due from him as guardian. He has been removed from the guardianship by the Orphan’s Court, and John Pim (the appellant,) appointed in his place. William Pim, having lived about two years with Thomas Stalker, opened a store at Bowningstown, where he did business for about three years, and then became bankrupt. He says, that before he opened this store, he had received a legacy of two thousand four hundred dollars from *71 his mother; and he took with him to Downingstown about eighteen hundred dollars, including the money of the minots. Thomas Stalker was informed by William Tim of the situation of Mitchenor’s eslute. He told Pim, he ought to press the administrators for the money due from them; but Pim did not think it worth while, supposing that they were unable to pay it, Thomas Stalker was informed also of the money which was in thé hands of Pim, as guardian, but never proposed to him to secure it or have it put out at interest. On the contrary, he borrowed money to the amount of one thousand dollars of Pim, at different times, which he paid him; and (what is very im'portant,) knowing that Pim was going to employ, not only his private funds, but the money which he held as guardian, in trade, he paid him eight hundred dollars just before he opened his store at I)owningstown. It appears, that Thomas Stalker was in bad health for two or three years before his death, which took place in May, 1820. In the first place, then, was Thomas Stalker responsible for the balances due from the administrators of Thomas Mitchenor, which, supposing seven hundred dollars to have been paid to the guardians, and, deducting the widow’s third, would be about two hundred and seventy-four dollars. -In case of gross negligence, trustees are responsible. But I cannot say that the evidence in this case is sufficient to fix the responsibility on Thomas Stalker. It has been said, at the bar, that the sureties in the administration bond are insolvent; but that part of the ease is very obscure. We have had no evidence about it. We know not whether they were in good credit during Stalker’s life, or whether there was a probability of getting the money, if they, or the administrators themselves had been sued. William Pim told Thomas Stalker that a suit would answer no purpose. If it had been made out, to a reasonable probability, that the debt had been lost by the neglect of the guardians, Stalker would have been answerable. But I do not think it has. Let us consider, then, how the case stands, as to the seven hundred dollars received by William Pim, the eo-guardian. How far one trustee shall be responsible for money received by another, is a very delicate and important subject, on which the law does not appear to be yet well settled. It is sufficiently settled, however, for. the present purpose. It is clear enough, that where one who does not receive the money consents that the other should misapply it, particularly where he has it in his power to secure it, he is responsible. I am sorry that a loss should fall upon an innocent old man, whose energy was probably weakened by bodily infirv.hv; but the circumstances of this case: are too strong to be got over. Besides, while trustees are protected, as long as they act with reasonable diligence, jt is of great moment that the interests of minors should not be sacrificed. Now, Thomas Stalker ought to have been particularly on his guard, as he knew that his *72 responsibility was depended on. His colleague was a young man, without fortune, not fit to be trusted alone. He knew that the property of the children was in the hands of this colleague. He had him in his house, and employed him in the business of his farm. One cannot help perceiving, that he .had it in his power to do, what was his duty; that is, either to have the money put out at interest, or insist on William Pirn’s giving good security for it. But instead of that, how strange was his conduct! He borrowed money of Pim, from time to time, probably this very money, (for it was mixed with Pirn’s other money;) and, when he knew that Pim was going to employ it in trade, and had an opportunity of securing it, he suffered it to be misapplied. Nothing would have been easier, than to secure it. He had eight hundred dollars in his hands; he might have insisted, that the seven hundred dollars which' belonged to the children, should not be put to the hazard of trade without good security. I consider this money as perfectly under his control; and his parting with it, under the circumstances of the case, a breach of trust. It is said by the Chancellor, in-the case of Monell v. Monell, (5 Johns. Ch. R. 286,) that “ if money be paid to one trustee, by the act, direction, or agreement of the other, where he had it in his power to controul or secure it, he is responsible.” And in 2 Madd. 64, 141, (Hartford Ed.) it is laid down, that if a trustee consent that his co-trustee shall detain a sum of money belonging to the trust estate, both are responsible. Thomas Stalker was extremely negligent, in not pressing for security in the year 1818, when William Pirn’s goods were levied on by the sheriff, and he himself became security for him. This surely was enough to put him on his guard, and yet he suffered the money of the infants to remain in jeopardy, without an effort to-secure it. From the evidence laid before us, if Pim had'been pressed, after .the levy on his goods, there would have been a good chance of his finding security; for several witnesses say, that he was in pretty good credit, till after the time of Stalker’s death. I am clear, therefore, that Stalker is responsible for the sum of seven hundred dollars, which was in the hands of William Pim, as guardian. And he should pay interest too, from the time that tbe breach of trust can be fairly fixed on him. This may be said-to be about the 1st of January, 1818. Perhaps it might be carried farther back, but as it is difficult to fix the precise period, I would settle it so as to be sure of doing no injustice to Stalker. From the evidence of William Pim, it certainly could not have been later than the 1st of January, 1818, when Stalker * consented to the misapplication of the money. I am of opinion, therefore, that the decree of the Orphans’ Court should be reversed, and the estate of Thomas Stalker charged with the sum of seven hundred dollars, and interest thereon from the 1st of January, 1818. Judgment reversed.